[No. D022743. Fourth Dist., Div. One. June 19, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEXANDER RUTAN JOEHNK, Defendant and Appellant.

**COUNSEL**

Francis J. Bardsley, Public Defender, and Jeffrey E. Thoma, Deputy Public Defender, for Defendant and Appellant.

John W. Witt, City Attorney, Susan M. Heath, Chief Deputy City Attorney, and Annie Tomasik Sahhar, Deputy City Attorney, for Plaintiff and Respondent.

## OPINION

**BENKE, Acting P. J.**—Defendant and appellant Alexander Rutan Joehnk was convicted of driving under the influence of an alcoholic beverage (Veh. Code,[1] § 23152, subd. (a)), and of driving with a blood-alcohol level of 0.08 or higher (§ 23152, subd. (b)). He appeals, arguing the trial court erred in allowing a police officer to use findings from horizontal gaze nystagmus (HGN) testing as a basis for his opinion that appellant was driving under the influence of alcohol. We conclude HGN testing admissible for that purpose and affirm.

### FACTS

On August 24, 1993, appellant was stopped by San Diego Police Officer Christopher Brush for driving with a defective brake light. On contacting appellant the officer smelled alcohol on his breath, noticed his eyes were watery and bloodshot, his pupils dilated and slow to react to light, his speech slurred, his gait unsteady and his clothing dirty.

The officer performed an HGN test on appellant. The test requires the subject follow a horizontally moving object, such as a pen, held close to the eyes. The officer noticed appellant's eyes did not smoothly follow the object, there was a moderate onset of nystagmus, that is, a spasmodic motion of the eyeball at the extreme deviation of the subject's horizontal gaze and "bouncing" of the eyeball prior to it reaching a gaze angle of 45 degrees. Based on the officer's training, such findings, taken with other indications, suggested appellant was under the influence of alcohol.

The officer administered additional field sobriety tests. Appellant passed some, failed some and had mixed results on others. Based on all his observations, Officer Brush concluded appellant was driving under the influence of alcohol and placed him under arrest. A blood test indicated appellant's blood-alcohol level was .11.

At trial, criminalist Jim Stam testified HGN testing is a reliable indicator of alcohol impairment, that while a blood-alcohol level cannot be accurately estimated based on the test, its results, taken with other factors, can indicate a suspect was driving under the influence of alcohol.

---

[1] All statutory references are to the Vehicle Code unless otherwise specified.

## DISCUSSION

■ Appellant argues the use of HGN testing is not generally accepted in the relevant scientific community as reliable and thus its results could not be used by Officer Brush as a basis for his opinion concerning appellant's intoxication. He further argues, assuming HGN testing is generally accepted in the relevant scientific community, a police officer is not qualified to testify concerning the results of the test. Additionally, appellant argues the test in this case was not properly administered and on that basis its results should not have been admitted. (See *People* v. *Leahy* (1994) 8 Cal.4th 587, 591, 594-610 [34 Cal.Rptr.2d 663, 882 P.2d 321] (*Leahy*); *People* v. *Kelly* (1976) 17 Cal.3d 24, 30-32 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*).)

### A.  *HGN and Intoxication*

■ "Nystagmus is an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotatory. [Citation.] An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words jerking or bouncing) is known as horizontal gaze nystagmus, or HGN. [Citation.]" (*People* v. *Ojeda* (1990) 225 Cal.App.3d 404, 406 [275 Cal.Rptr. 472].) The theory supporting HGN testing is that intoxicated persons exhibit HGN and that a field test conducted by a police officer can identify the condition. (*State* v. *Superior Court* (1986) 149 Ariz. 269 [718 P.2d 171, 181, 60 A.L.R.4th 1103] (*Blake*); *City of Fargo* v. *McLaughlin* (N.D. 1994) 512 N.W.2d 700, 706; see also dis. opn. of Baxter, J., in *Leahy, supra*, 8 Cal.4th at pp. 622-633.)

#### 1.  *Test of Admissibility*

In *Leahy* our Supreme Court concluded the results of an HGN test are admissible only if the technique and the scientific basis for it satisfy the requirements of *Kelly, supra*, 17 Cal.3d at page 30. (*Leahy, supra*, 8 Cal.4th at pp. 591-592.)

■ To satisfy *Kelly*, new forms of scientifically based evidence must satisfy a three-part test. "First, the party offering the evidence must show that the technique is ' "sufficiently established to have gained general acceptance in the particular field in which it belongs." ' [Citation.] Second, the proponent of the evidence must establish that 'the witness furnishing such testimony' is 'properly qualified as an expert to give [such] an opinion . . . .' [Citation.] Third, the proponent must demonstrate that 'correct scientific procedures were used in the particular case.' [Citations.]" (*People* v. *Diaz* (1992) 3 Cal.4th 495, 526 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

■ "Review of a trial court's decision finding that a new scientific procedure has been ' " 'sufficiently established to have gained general acceptance in the particular field in which it belongs' " ' (italics omitted) and therefore that it is admissible in a criminal trial is a 'mixed question of law and fact subject to limited de novo review.' [Citation.]

"The appellate court reviews 'the trial court's determination with deference to any and all supportable findings of "historical" fact or credibility, and then decide[s] as a matter of law, based on those assumptions' not ' "whether [the technique] is reliable as a matter of 'scientific fact,' but simply whether it is generally accepted as reliable by the relevant scientific community." [Citations.]' [Citation.]

"In conducting the review, the appellate court primarily relies on the record below [citations] but it may also consider out-of-state opinions and scientific literature bearing on the question whether the scientific technique at issue has gained acceptance in the scientific community. [Citations.]" (*People* v. *Marlow* (1995) 39 Cal.App.4th 343, 376 [41 Cal.Rptr.2d 5] review granted July 20, 1995 (S046966).)

## 2. *HGN Evidence*

In its motion seeking admission of HGN test results as a basis for Officer Brush's opinion, the prosecution offered both testimony and scientific and professional articles on the nature of HGN and HGN testing.

Dr. Marcelline Burns, a research psychologist, testified she was a founder of the Southern California Research Institute which studies the effects of alcohol and drugs on behavior and performance. In 1975 and again in 1978, Burns conducted tests for the National Highway Traffic Safety Administration (NHTSA) to establish a battery of sobriety tests that could be administered by police officers in the field.

Burns explained the term nystagmus and indicated its horizontal version could be induced by several conditions, including the ingestion of alcohol and other central nervous system depressants. A small number of persons have a congenital condition causing nystagmus. The phenomenon is medically recognized and nystagmus tests are used by physicians as a tool for determining whether a patient is intoxicated or has neurological problems.

Burns indicated the first studies of nystagmus as an indicator of intoxication were conducted in Finland in the early 1970's. Burns, in her studies for the NHTSA, was interested in developing a valid field test for determining intoxication. The studies found that by using three tests, one of which was

HGN testing, trained officers were correct 81 percent of the time in identifying test subjects with a .10 blood-alcohol level. Later, field studies by other researchers indicated HGN was a valid indicator of intoxication. In Burns's opinion, a correctly conducted HGN test is a highly reliable indicator of intoxication. Burns stated that of the three tests used in the field sobriety examination, that is, the walk and turn test, the one leg stand test and the HGN test, the HGN test is the most sensitive and least subject to the effects of alcohol tolerance.

Burns further testified she keeps current on scientific literature and opinion concerning HGN and its use in detecting intoxication in drivers. She stated the scientific community concerned with HGN as a test for intoxication was comprised of behavioral psychologists, highway safety experts, criminalists and medical doctors concerned with the recognition of alcohol intoxication. Burns stated in this community the HGN test was accepted as a reliable indicator of intoxication and she was unaware of any scientific literature stating it was not.

Burns testified the test is conducted by holding an object, such as a pen, 12 to 15 inches in front of and slightly above the subject's eyes. The object is moved in a horizontal plain from one side to the other. The officer administering the test first watches the smoothness of the subject's eyes in tracking the object. As the eyes reach their maximum lateral deviation, the observer watches the amount of jerking in the eyeball. Burns indicated about half the population shows jerking at this point of deviation naturally, possibly as the result merely of eye strain. Finally, the observer has the subject track the object back to center and then tract it again laterally. The observer's notes the degree of lateral deviation at which the eye first begins to show distinct jerking, i.e., horizontal nystagmus, and determines whether it begins before 45 degrees of deviation from center.

Burns further testified she had observed Officer Brush's technique in using the HGN test and determined he used it correctly.

James Stam, a supervising criminalist for the San Diego Police Department crime laboratory with a bachelor's degree in criminology from the University of California, Berkeley, testified he had been involved in over 30 studies concerning alcohol ingestion and impaired performance and kept current on the literature in that field. Stam stated he was familiar with the HGN test as an indicator of intoxication.

Stam discussed the phenomenon of nystagmus. He noted nystagmus could be caused by a number of conditions other than alcohol ingestion and in

about 4 percent of the population it occurs naturally. Stam noted HGN is an extremely reliable indicator of alcohol consumption and particularly useful since not affected by alcohol tolerance. He stated, however, HGN testing could not reliably be used to correlate given degrees or types of nystagmus to particular levels of blood alcohol. Stam noted medical doctors used the test in emergency rooms as an indicator of intoxication. It was Stam's conclusion HGN was accepted as a reliable indicator of alcohol consumption in those scientific fields, such as emergency room medicine and criminalistics, which studied and used it.

The People also offered the testimony of independent forensic scientist and toxicologist Richard Whalley. Whalley holds a bachelor's degree in forensic sciences from the University of California, Berkeley, and has extensive experience in forensics, working both for the prosecution and the defense. Whalley has both academic and practical experience with the effect of alcohol on body systems.

Whalley stated nystagmus can be the result of congenital, pathologic or toxic causes. One of the toxic substances that can cause nystagmus is alcohol. The specific mechanism of alcohol induced nystagmus was not understood.[2] Nonetheless, the consumption of alcohol was known to cause detectable nystagmus.

Whalley stated that as a scientist he used the HGN test as an indicator of alcohol consumption and that a finding of nystagmus indicates the subject may have consumed alcohol. Whalley stated he was familiar with the medical literature concerning HGN and that it supports use of the test as one indicator that a subject is under the influence of alcohol. He also stated within the fields of criminalistics and forensic alcohol analysis, HGN was accepted as a reliable indicator that a subject is under the influence of alcohol. Whalley stated, however, the test could not reliably be used to accurately estimate blood-alcohol levels.

Officer Christopher Brush was the officer who administered the HGN test to appellant. Brush was a 12-year veteran of the San Diego Police Department and had been in the traffic division for 4 years. Brush had extensive training and experience on the general subject of driving under the influence

---

[2] In *Emerson v. State* (Tex.Crim.App. 1994) 880 S.W.2d 759, the court, citing Stapleton et al., *Effects of Alcohol and Other Psychotropic Drugs on Eye Movements: Relevance to Traffic Safety*, 47 J. Stud. on Alcohol 426, 427-428, states: "Alcohol magnifies the reflexes of the vestibular-optokinetic system that causes nystagmus, by impairing the normal ability of the oculomotor system to suppress the responses of the sensory receptors and otoliths, resulting in an earlier onset of nystagmus in the angle of gaze and pronounced nystagmus at maximum lateral deviation." (880 S.W.2d. at p. 766, fn. 3.)

and was trained to give and interpret the results of the HGN test. Brush had used the test several thousand times. Brush was instructed that while a finding of nystagmus indicated the possibility the subject was under the influence of alcohol, such a finding could also be the result of other conditions. The officer was taught that no conclusion was to be drawn solely from the results of the HGN test but rather those results were to be used with other facets of the investigation in concluding whether the subject was under the influence of alcohol.

Dr. Philip Wagner, an internist and emergency room physician, testified for the defense. Wagner testified horizontal nystagmus can be caused by trauma, disease, fatigue or by toxins and exists naturally in some persons. The doctor has conducted a form of HGN test on persons who were intoxicated. Wagner agreed alcohol intoxication could cause nystagmus but stated its physiological mechanism was unknown. The doctor stated it was not possible to distinguish nystagmus caused by the ingestion of alcohol from that caused by any other condition or causes.

Wagner stated he had reviewed the studies linking HGN to alcohol intoxication and believed those studies of poor quality and either biased or flawed. The doctor believed the studies were conflicting on whether officers could accurately measure the angle of onset of horizontal nystagmus.

The doctor was asked if it was an established medical fact that a certain alcohol level can affect the angle of onset of horizontal nystagmus. He stated it was not. Wagner also explained it was not standard practice for physicians to measure for the onset of gaze nystagmus.

On cross-examination Wagner stated a lateral nystagmus test was a routine part of a medical examination and the presence of nystagmus can indicate alcohol intoxication. The test is not, however, specifically used by physicians to determine intoxication. The doctor indicated that until three weeks before his testimony he had done no research on HGN as an indicator of intoxication.

Wagner stated a lateral nystagmus test would be useful when used with other indicators in determining if a patient was intoxicated on alcohol or another depressant. The doctor had seen lateral nystagmus as a result of alcohol intoxication in approximately 1,000 patients. The doctor does not, however, use an angle of onset nystagmus test as part of his examination and does not consider it reliable.

Wagner was unaware of any medical articles stating that a lateral nystagmus test should not be used as one factor in determining whether a person was intoxicated.

Wagner stated if a patient presented a lack of coordination, an odor of alcohol and watery eyes, a lateral nystagmus would be an indication the patient was intoxicated or had used another drug such as an antihistamine.

### 3. California Cases

Four California cases have dealt with the admissibility of HGN. In *People v. Loomis* (1984) 156 Cal.App.3d Supp. 1 [203 Cal.Rptr. 767], a police officer offered an opinion of a defendant's blood-alcohol level based on his observation of the angle of onset of lateral nystagmus. The court found HGN to be a new form of scientific evidence and subjected it to the *Kelly* test of admissibility. The court found no evidence of the reliability or general scientific acceptance of the HGN test as a means of determining blood-alcohol levels and held the evidence inadmissible. (*Id.* at pp. Supp. 5-7.)

In *People v. Ojeda, supra*, 225 Cal.App.3d 404, an officer was allowed to testify that he observed lateral nystagmus in the defendant and that based on his experience he associated the phenomenon with persons under the influence of alcohol. The Court of Appeal noted no objection was made below on the basis HGN testing lacked general scientific acceptance. The court limited its review to whether the officer was qualified to testify that based on his experience nystagmus was a reliable indicator of alcohol intoxication. The court found the officer's experience using the technique qualified him to so testify. (*Id.* at pp. 406-409.)

In *People v. Williams* (1992) 3 Cal.App.4th 1326 [5 Cal.Rptr.2d 130] (*Williams*), an officer was allowed to testify that based on all his observations, including the HGN testing, it was his opinion defendant had consumed alcohol. The trial court concluded the testimony was admissible, holding it was lay rather than expert opinion. The Court of Appeal disagreed, concluding that insofar as the opinion was based on the results of the HGN test, it required knowledge, training and experience beyond that commonly held and, thus, was not the proper subject of lay opinion. (*Id.* at pp. 1332-1333.)

The court in *Williams* assumed the officer was qualified to administer the test and observe nystagmus but held attributing test findings to a particular cause required an expertise the officer had not demonstrated. The court stated: "Without some understanding of the processes by which alcohol ingestion produces nystagmus, how strong the correlation is, how other possible causes might be masked, what margin of error has been shown in statistical surveys and a host of other relevant factors, [the officer's] opinion on causation, notwithstanding his ability to recognize the symptom, was unfounded. It should have been excluded." (3 Cal.App.4th at p. 1334.) The

court concluded results of HGN testing might be admissible if linked to qualified expert testimony concerning those matters. (*Id.* at pp. 1333-1334.)

The court in *Williams* further noted the People offered the testimony of the supervisor of the alcohol analysis section of the county regional crime lab. The expert did not comment on the particular test given by the officer or what caused the observed nystagmus. The expert testified generally about the administration of the HGN test and about the various possible causes for nystagmus. The court concluded on the record before it the expert's testimony was not admissible to give the jury a factual basis for concluding the officer's observation of nystagmus indicated intoxication. The court concluded the expert's information too general for providing such a predicate. The expert stated while alcohol could cause nystagmus, many other factors could cause it as well, and he did not quantify the relationship between nystagmus and alcohol ingestion. The expert indicated a disagreement in the scientific community concerning the accuracy of the HGN for detecting alcohol and indicated some experts found it meaningless. (3 Cal.App.4th at p. 1335.)

In *Williams* the parties agreed the results of an HGN test were inadmissible unless generally accepted in the relevant scientific community as required by *Kelly*. The court concluded it would be inappropriate to address the question on the record before it.

In *Leahy*, the court held the results of HGN testing were inadmissible unless it was first shown the technique was generally accepted as reliable in the relevant scientific community. The record in that case, however, was insufficient to make such a determination and the matter was remanded for a *Kelly* hearing. (8 Cal.4th at pp. 604-613.)

Justice Baxter dissented on several grounds from the conclusion it was necessary that HGN testing satisfy the *Kelly* test of admissibility. Justice Baxter observed that HGN testing differed markedly from other techniques or processes to which *Kelly* had been applied. The *Kelly* test was designed for situations in which testimony was based on esoteric methods or apparatus, the evaluation of which was beyond common capabilities. HGN testing, Justice Baxter argued, did not fit in that category. The nature of the test was readily comprehensible and there was no mystery about the manner of evaluation or its meaning as one factor in an officer's opinion concerning intoxication. The technique simply did not carry an " 'undeserved aura of certainty' " (*Leahy, supra,* 8 Cal.4th at p. 619 (dis. opn. of Baxter, J.)), nor purport to provide some definitive truth. Justice Baxter acknowledged the situation might be different if the officer used the test as a means of determining a blood-alcohol level. (*Id.* at pp. 617-619.)

Justice Baxter noted the core premises of HGN testing, that is, that intoxicated persons exhibit nystagmus and that a properly trained individual can observe nystagmus, were undisputed. (8 Cal.4th at pp. 622-624 (dis. opn. of Baxter, J.).)

### 4. Authority From Other Jurisdictions

The HGN field sobriety test has been in wide use nationally for many years and has been reviewed by the courts of a host of states. The legal landscape concerning the test is made relatively complex by several factors. First, many states no longer apply a *Kelly/Frye*-style general acceptance test. (See *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145].) Having adopted the Federal Rules of Evidence and in particular rule 702 (28 U.S.C.), they use a more liberal test for the admission of scientific evidence like that defined in *Daubert* v. *Merrell Dow* (1993) 509 U.S. __ [125 L.Ed.2d 469, 113 S.Ct. 2786] (*Daubert*).[3] Other states have concluded HGN testing to be nonscientific in the *Frye* sense and consider it no different than the other components of the field sobriety test which do not require a scientific basis for their admission. (See, e.g., *State* v. *Murphy*, *supra*, 451 N.W.2d 154, 157-158; *State* v. *Nagel* (1986) 30 Ohio App.3d 80 [506 N.E.2d 285, 286].)[4]

Second, cases have dealt with several uses of the technique. For example, courts have dealt with the assertion by some law enforcement agencies that HGN can be used not just as a general indicator of intoxication but also as a reliable device for determining a blood-alcohol level. (See, e.g., *People* v. *Loomis*, *supra*, 156 Cal.App.3d at pp. Supp. 5-7.) (As noted the People made no such claim in this case and their experts stated no such correlation could reliably be made.)

---

[3] A *Daubert* analysis is broader than one conducted under *Kelly*. *Daubert* begins with the statement in rule 702 that if scientific knowledge would assist the trier of fact to understand the evidence or determine a fact, a qualified expert may testify concerning it, including in the form of an opinion. In deciding if the testimony is scientific, the court looks to many factors, including whether the theory or technique can and has been tested, and whether it has been subjected to peer review; also of importance is the theory or technique's potential rate of error. Also of importance, but not determinative, is the general acceptance of the theory or technique. (*Daubert*, *supra*, 509 U.S. at p. __ [125 L.Ed.2d at pp. 478-485].)

Most courts that have applied a *Daubert*-type analysis to HGN testing as a field sobriety test have found it admissible. (See, e.g., *Emerson* v. *State*, *supra*, 880 S.W.2d at pp. 764-770; *State* v. *Conner* (1995) 132 Ore.App. 478 [888 P.2d 1087, 1089]; *State* v. *Glean* (1992) 132 Idaho 62 [844 P.2d 691, 694-695]; *State* v. *Murphy* (Iowa 1990) 451 N.W.2d 154, 165-158; *State* v. *Clark* (1988) 234 Mont. 222 [762 P.2d 853, 856-857]; see also *State* v. *Bresson* (1990) 51 Ohio St.3d 123 [554 N.E.2d 1330, 1332-1336].) Some courts have found the record before them insufficient as a basis for determining general scientific acceptance. (See, e.g., *Comma.* v. *Apollo* (1992) 412 Pa.Super. 453 [603 A.2d 1023, 1025-1028].

[4] A good review of the legal spectrum on this issue can be found in *City of Fargo* v. *McLaughlin*, *supra*, 512 N.W.2d 700, 704-706, and *State* v. *Merritt* (1994) 36 Conn.App. 76 [647 A.2d 1021, 1025-1027].

Finally, the nature of the *Kelly/Frye* rule itself and the practicalities of litigation make for an uneven and somewhat unreliable body of case authority. The core of the *Kelly/Frye* rule is that the admissibility of new scientific evidence is not dependent on the evaluation of the technique or process by judges but rather on a finding that a clear majority of the relevant scientific community accepts the technique as reliable. The courts to a great extent are dependent on the records in individual cases in making this *Kelly/Frye* determination. While a body of scientific literature may exist concerning a technique, it is unwise to rely too heavily on such literature without expert testimony evaluating it and without cross-examination concerning that evaluation. (See *Leahy, supra*, 8 Cal.4th at pp. 611-612.) The records in cases can vary depending not only on the experts who testify but on the point in the development of a technique and its review by the scientific community at which the evidentiary hearing is held.

The most important case applying a *Kelly/Frye* analysis to HGN testing is *Blake, supra*, 718 P.2d 171. At trial, the state offered the testimony of Dr. Marcelline Burns, one of the experts in the present case, a police sergeant from the Los Angeles Police Department and two police sergeants from Arizona. The experts testified concerning the development, uses and general acceptance of the technique in the highway safety field. (*Id.* at pp. 173-174.) In two appendices the court included lists of literature concerning HGN submitted by the state and found by the court. (See *id.* at pp. 182-184.) The defense offered no experts, instead it argued there was a paucity of literature from the appropriate scientific community, which it defined as neurology, ophthamology, pharmacology and criminalistics, and that the relevant community had not yet had a chance to evaluate the technique. (*Id.* at pp. 179-180.)

Like our Supreme Court, the Arizona Supreme Court concluded HGN testing relied on a scientific rather than a common experience basis and thus had to satisfy the *Frye* test. The court first sought to identify the relevant scientific community to which HGN testing belonged. The court concluded a relevant community is often "self-selecting," that is, only those scientists interested in a new technique are likely to evaluate it. The court concluded HGN was a behavioral phenomenon dealing with the effects of alcohol on eye movement and thus would be of interest to behavioral psychologists. The court also reasoned that because the effects of alcohol are of interest to scientists in the area of highway safety, they should be included in the relevant scientific community as well. (718 P.2d at pp. 179-180.)

The court rejected any argument that scientists concerned with traffic safety or the enforcement of drunk driving laws were somehow biased. It

noted the studies which led to the field sobriety test, of which HGN testing was a part, were funded by the NHTSA to give officers a reliable means of distinguishing between impaired and unimpaired drivers. The court noted law enforcement had no interest in unreliable field sobriety tests. (718 P.2d at p. 180.)

The court stated a small part of the neurological community concerns itself with the effects of alcohol on performance and thus should be included in the relevant scientific community. The court also included the criminalistics community concerned with the detection of drunk drivers. The court further noted no argument was made that either pharmacology or ophthalmology was concerned with the issue and the court did not include those fields in the relevant community. (718 P.2d at p. 180.)

Having defined the relevant community, the court noted that universal acceptance in that community was not required nor was it necessary the technique be absolutely accurate or certain. It found the evidence supported the following conclusions: "(1) HGN occurs in conjunction with alcohol consumption; (2) its onset and distinctness are correlated to BAC [blood-alcohol content]; (3) BAC in excess of .10 percent can be estimated with reasonable accuracy from a combination of the eyes' tracking ability, the angle of onset of nystagmus and the degree of nystagmus at maximum deviation; and (4) officers can be trained to observe the phenomena sufficiently to estimate accurately whether BAC is above or below .10 percent." (718 P.2d at p. 181.)

While the court found sufficient evidence to support the conclusion that HGN testing was generally accepted as a means of determining blood-alcohol levels, the court for constitutional and statutory reasons rejected its admissibility for that purpose. The court held the evidence of the results of HGN testing was admissible only to corroborate the accuracy of chemical tests and as evidence that a suspect was under the influence of alcohol. (718 P.2d at pp.181-182.) In *State* ex rel. *Hamilton* v. *City Court of City of Mesa* (1990) 165 Ariz. 514 [799 P.2d 855, 857-860], the court reaffirmed its decision in *Blake*.[5]

In *State* v. *Klawitter* (Minn. 1994) 518 N.W.2d 577, the Supreme Court of Minnesota addressed the admissibility of a 12-step "drug recognition protocol" as evidence that a defendant was driving under the influence of a

---

[5]Other courts agree that HGN testing satisfies the *Frye* general acceptance test. (See *People* v. *Buening* (1992) 229 Ill.App.3d 538 [170 Ill.Dec. 542, 592 N.E.2d 1222, 1227-1228]; *People* v. *Wiebler* (1994) 266 Ill.App.3d 336 [203 Ill.Dec. 597, 640 N.E.2d 24, 26-27]; *State* v. *Armstrong* (La.Ct.App. 1990) 561 So.2d 883, 885-887.)

controlled substance. One component of that protocol was HGN testing. A *Frye* hearing was conducted to determine whether HGN testing was generally accepted as reliable in the scientific community to which it belonged. Dr. Marcelline Burns, one of the experts who testified in this case and in the *Blake* case, a police sergeant, an optometrist and a jail physician testified that nystagmus was a reliable and accepted indicator of drug use. (*State* v. *Klawitter*, *supra*, 518 N.W.2d at pp. 581-583.)

Defense experts stated while nystagmus might indicate drug use, police officers could not be trusted to perform the test since even physicians had difficulty performing the test and the symptom could be caused by other conditions. Other defense experts questioned the studies on which the drug protocol was based and the adequacy of review of the protocol by the scientific community. (518 N.W.2d at pp. 583-584.)

With regard to the nystagmus portion of the test, the court stated: "All of the experts recognized that the tests for nystagmus employed in the drug evaluation are standard neurological tests. The defense experts' challenge was directed to the utility of the tests for ascertaining drug impairment. The defense experts did not suggest that the use of certain drugs may not cause nystagmus but, rather that nystagmus is not 'necessarily' present in all cases of drug use. It is not contended, however, that the presence or absence of nystagmus is determinative of the presence of drugs, but only that nystagmus, when it is present, may be an element supportive of a conclusion of drug impairment based on the elements of the protocol, taken as a whole." (518 N.W.2d at p. 585.) With certain restrictions the court allowed the admissibility of an officer's opinion concerning drug impairment based on the protocol. (*Id.* at p. 586.)

Of particular interest in a review of cases applying *Frye* to HGN testing is the Kansas Supreme Court's opinion in *State* v. *Witte* (1992) 251 Kan. 313 [836 P.2d 1110] (*Witte*)). *Witte* is similar to several cases dealing with HGN testing, including our Supreme Court's *Leahy* opinion, in that it declares such testing to have a scientific basis and remands the matter to the trial court for a *Frye* hearing. *Witte* is particularly important, however, since it suggests that if the Arizona Supreme Court was deciding *Blake* in 1992 instead of 1986 and had before it the literature the Kansas court reviewed, it might have decided the case differently. (*Id.* at pp. 1119-1121.)

The court in *Witte* concluded the literature on the topic indicated a mixed reaction to HGN testing. The court cites five publications, two from American Jurisprudence Proof of Facts, one from the DWI Journal, one from Erwin, Defense of Drunk Driving Cases, and one from Nichols, Drunk

Driving Litigation, indicating HGN testing was not accepted in the scientific community.[6] The court stated these sources were either not mentioned in the *Blake* case or were written after that case was decided. (836 P.2d at p. 1119.)

The *Witte* court also noted a disagreement in the literature concerning the correlation between blood-alcohol level and the angle of onset of lateral nystagmus. The court stated had the *Blake* court been aware of this "new" information, it might not have determined that HGN testing was generally accepted as reliable. (836 P.2d at pp. 1120-1121.)

### 5. *Discussion*

■■■ We begin by noting the relatively humble claims made in this case for HGN testing. First, there is no claim HGN testing alone can determine whether a suspect is under the influence of alcohol nor determine a blood-alcohol level. Such testing is a component of a three-part field sobriety test which itself is only part of an officer's total observations of a suspect and is only one basis for an officer's opinion concerning intoxication. Neither is it claimed that HGN is caused only by alcohol intoxication. The proponents of the technique readily concede nystagmus can be caused by a number of conditions and toxins. In light of these concessions, we tend to agree with the following observation by the Iowa Supreme Court: "[T]he principal obstacle to the admissibility of the horizontal gaze nystagmus test may be its pretentiously scientific name." (*State* v. *Murphy*, *supra*, 451 N.W.2d at p. 156.)

That nystagmus testing is neither definitive nor able to determine intoxication alone, does not, of course, render it irrelevant. Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

With these observations in mind, we consider whether HGN testing as used in this case satisfies scrutiny under *Kelly*. The specific question, given the evidentiary use to which the testing was put, is whether a clear majority of the relevant scientific community accepts that the three-part HGN test is useful, when viewed with other relevant indications, in deciding whether a subject is under the influence of alcohol.

---

[6]Specifically, *Witte* cites Cowan and Jaffee, Proof and Disproof of Alcohol-Induced Driving Impairment Through Evidence of Observable Intoxication and Coordination Testing, 9 Am.Jur.3d Proof of Facts section 12, page 459; Pangman, *Horizontal Gaze Nystagmus: Voodoo Science* (1987) 2 DWI J. 1, 3-4; Rouleau, Unreliability of the Horizontal Gaze Nystagmus Test, 4 Am.Jur.3d Proof of Facts section 7, pages. 439, 452; 1 Erwin, Defense of Drunk Driving Cases (3d ed. 1992) §§ 8A:06, 8A:08; 2 Nichols, Drinking Driving Litigation (1991 & 1992 supp.) section 26.01.

We conclude the evidence offered by the prosecution in this case establishes HGN testing is so accepted. The People's three experts, Burns, an eminent behavioral psychologist whose research resulted in the field sobriety test adopted by the NHTSA (including the HGN part of the test), Stam, a police department criminalist with extensive knowledge and experience in the field of alcohol ingestion and impaired performance, and Whalley, a highly qualified independent criminalist with extensive experience concerning alcohol impairment, all testified the three-part nystagmus test administered by Officer Brush is a useful tool, in conjunction with other indicators, in forming an opinion concerning intoxication. Each of the witnesses also testified the technique was accepted as such in the relevant scientific community.

Several matters in this regard require comment. Only Burns defined the relevant scientific community to which nystagmus testing, as a component of alcohol impairment investigation, belongs. She defined this community as behavioral psychologists, her field, highway safety experts, criminalists and medical doctors concerned with the recognition of alcohol intoxication. This definition is essentially that stated by the Arizona Supreme Court in *Blake*.

We think this definition of the relevant scientific community is a correct one. Science is not a collection of monolithic and exclusive entities. Often, especially in forensic science, a technique or procedure may be of interest to subsets of scientists in several fields and conversely of no interest to other scientists in those fields. Thus, as the court in *Blake* noted, the relevant scientific community with regard to a particular theory or technique may be self-selected. While this fact can create complications in identifying scientific communities with new techniques when self-selection has not yet occurred, it is of little concern when, as here, the technique has been in existence for many years. Under such circumstances, a scientific community, if self-selected, can be identified. We conclude that Stam's and Whalley's reference to the relevant scientific community was to the same multidiscipline community defined by Burns and the Arizona Supreme Court in *Blake*.

Next, it is necessary to consider Burns's status as an expert. Burns was much involved in the development of the field sobriety test used in this case and its nystagmus component. She is a long-time proponent of the technique. In *Kelly* our Supreme Court voiced reservations about an expert on the issue of general acceptance who "has virtually built his career on the reliability of the [technique in question]." (*Kelly, supra,* 17 Cal.3d at p. 38.) The court stated such an expert might be too closely identified with the endorsement of the technique to assess fairly and impartially the extent of opposing scientific views. (*Ibid.*; see also *People* v. *Brown* (1985) 40 Cal.3d 512, 530 [220 Cal.Rptr. 637, 709 P.2d 440].)

In *Kelly* the expert was the sole witness to testify concerning the technique in question. In addition, that expert's scientific qualifications were suspect. (*Kelly, supra,* 17 Cal.3d at pp. 36, 38.) In this case Burns's testimony suffered from neither of these problems. She was open fully to cross-examination and the defense was able to present any evidence it wished in opposition to her opinions. We have no reservations about the testimony of Burns.

We next consider the testimony of defense expert Wagner. We think Wagner's testimony of little value. Wagner is a physician whose interest in the use of nystagmus testing as a field sobriety test, and the research concerning it, did not arise until he was asked to testify in this case. Not surprisingly, Wagner offered no opinion concerning the general acceptance of nystagmus testing as a reliable part of a field determination of intoxication. The doctor testified he was unaware of any medical literature stating a lateral nystagmus test should not be used as one factor in determining whether a person was intoxicated. Indeed, if we correctly understand the doctor's testimony, he stated a lateral nystagmus test is a routine part of a medical examination and that the presence of nystagmus can indicate intoxication.

Wagner's testimony in large part was an attack on the nature and form of the studies cited in support of the use of nystagmus testing as a field sobriety technique. The doctor believed the tests were poorly done and either flawed or biased. However, we see nothing in the record to support Wagner's qualifications to come to such conclusions. Whatever Wagner's qualifications as a physician, he is not a research scientist, nor a neurologist, nor a criminalist with a particular interest in nystagmus as an indicator of intoxication.

Next, we discuss the suggestion in *Witte, supra,* 836 P.2d at pages 1119-1121, that were the Arizona Supreme Court to consider HGN testing in 1992 rather than 1986, it might, in view of literature not mentioned in *Blake* or subsequently published, reach a different conclusion on the admissibility of HGN testing.[7]

We first note the courts in *Witte* and *Leahy* had a different problem than the one facing this court. In both those cases the issue was not the review of a *Kelly* hearing but rather whether such a hearing was required at all. Thus,

---

[7]In *Leahy* our Supreme Court cited this suggestion in *Witte* as one of the reasons for remanding the case for a *Kelly* hearing. (*Leahy, supra,* 8 Cal.4th at pp. 609-610. In *State* v. *Cissne* (1994) 72 Wn.App. 677, footnote 5 [865 P.2d 564, 568], the court cites *Witte* to the same effect.)

any indication that a controversy existed concerning the general acceptance of HGN testing or concerning its reliability was of importance.

*Witte* cites one set of articles which questions whether HGN testing is generally accepted in the relevant scientific community. However, each of the articles cited is from a legal, not a scientific, publication. (See fn. 7, *ante*.) ██ ██ While such articles may be useful as educational and research devices for the bench and bar, and while they may alert a court to the need for a full review of a technique, they are generally not authoritative materials either on primary scientific issues or on the ultimate issue of consensus in the relevant community.[8]

*Witte* also discusses scientific publications questioning whether there is a demonstrable correlation between the angle of onset of lateral nystagmus and particular blood-alcohol levels and the fact nystagmus can be caused or affected by factors other than alcohol ingestion. Given the form of citations to those publications, it is clear the court did not access them directly but instead found them noted in a legal article it had reviewed.[9] (*Witte, supra,* 836 P.2d at pp. 1119-1121.)

Once again, given the procedural posture in *Witte,* the court was correct to note such authority and cite its existence as a basis for remanding the matter for a full hearing on HGN testing. We do not, however, find *Witte* or its citations particularly illuminating in our procedural posture. First, given that the People in this case disavowed any claim that angle of nystagmus onset could be correlated with particular blood-alcohol levels, concerns about the ability of the technique to produce such results is meaningless. Further, as we have noted, we find, given the use to which the People put HGN testing in this case, the fact the condition can be caused or affected by other conditions is simply not determinative.

Having reviewed the record in this case and case authority from this and other jurisdictions, we conclude that a consensus drawn from a typical cross-section of the relevant, qualified scientific community accepts the HGN testing procedures used in this case as a useful tool when combined

---

[8]Articles from scientific publications continue, however, to have some limited utility in a *Kelly* determination. (See *Leahy, supra,* 8 Cal.4th at pp. 611-612; *People* v. *Shirley* (1982) 31 Cal.3d 18, 55-56 [181 Cal.Rptr. 243, 723 P.2d 1354]; see also *People* v. *Brown* (1985) 40 Cal.3d 512, 533-534 [220 Cal.Rptr. 637, 709 P.2d 440].)

[9]That article is Pangman, *Horizontal Gaze Nystagmus: Voodoo Science, supra,* 2 DWI J. 1, 2-4. The journal in which it appears is a legal one and not a scientific one. Pangman is a lawyer, not a scientist. The article is eight years old.

with other tests and observations in reaching an opinion whether a defendant was intoxicated.[10]

## B. *HGN Testing by Officer Brush*

■ Appellant argues, even assuming HGN testing satisfies *Kelly*, it was nonetheless error to allow an officer without scientific qualifications to form opinions concerning intoxication based on nystagmus findings. In *Leahy* our Supreme Court stated: "Defendant objects to this limited remand procedure, contending that even if *Kelly* were deemed satisfied, the question would remain whether police officers were qualified to testify regarding the HGN results. We reject this contention. Once it has been shown that HGN testing is generally accepted in the scientific community, no reason exists why police officers would be deemed unqualified to administer and report results of those tests. Thus, in future case, once the *Kelly* standard has been met, as reflected by a published appellate precedent, the prosecution will not be required to submit expert testimony to confirm a police officer's evaluation of an HGN test. Of course, nothing would prevent the defendant from challenging that evaluation with expert testimony of his own." (*Leahy*, *supra*, 8 Cal.4th at p. 611.)

Appellant also argues the People in this case failed to satisfy that prong of *Kelly* requiring that proper scientific procedures be used in the particular case. (*Kelly*, *supra*, 17 Cal.3d at p. 30.) Appellant bases his argument on the

---

[10]We make the following gratuitous comments: it is proper in a culture that tends to deify science, and in which lawyers, in seeking tactical advantage, are less concerned with the ultimate validity of scientific theories than with their evidentiary impact, that courts be wary in admitting testimony from witnesses who wear lab coats and speak in esoteric and impressive language. Still, it is important we encourage and do not discourage the development of reliable forensic sciences. Given the importance and difficulty of the factual determinations made at trial, it is inexcusable not to develop every means available to aid in making those determinations. An overly demanding approach to the admission of such evidence not only denies its use in particular cases but retards its general development.

In reviewing cases dealing with new scientific theories, a discouraging pattern appears. Often both the scientific and legal proponents of new techniques seem ill-prepared for the inevitable courtroom clash over the admissibility of the technique. Presentations are made with few or marginal experts, techniques are offered before a reasonable time has passed for the procedure or its forensic application to become familiar to scientists, no effort is made by proponents to encourage or expedite peer review, institutional proponents, such as prosecutors, seldom appear to take a coordinated approach to qualify a new technique by, for example, choosing appropriate cases as test vehicles and combining lawyers intimately familiar with the new technique with experts qualified to discuss the procedure and its acceptance in the scientific community. Often the process followed seems a haphazard one resulting in more mischief than illumination. We encourage proponents to be more selective in choosing the time and manner in which they first offer a new technique and encourage trial courts to be more active by, for example, calling their own experts to testify on new techniques.

statement by criminalist Whalley that Officer Brush's testing technique made it more difficult to determine the onset of nystagmus. Whalley, however, did not state the officer had used an improper technique, but rather had used a technique that was more difficult and required training and experience. Burns testified she observed Brush's testing technique and found he correctly conducted the test. The People satisfied *Kelly*'s requirement that proper scientific procedures be used.

The judgment is affirmed.

Froehlich, J., and Hoffman, J.,* concurred.

---

*Judge of the San Diego Superior Court sitting under assignment by the Chairperson of the Judicial Council.